| | |
|---|---|
| STATE OF MAINE<br>OXFORD, ss. | SUPERIOR COURT<br>CIVIL ACTION<br>DOCKET NO. CV-22-33 |
| JOAN M. KELLY,<br><br>    Plaintiff<br><br>v.<br><br>**OXFORD COUNTY**, is a County in the State of Maine,<br><br>**OXFORD COUNTY SHERIFF'S OFFICE**, an agency in Oxford County, State of Maine,<br><br>**CHRISTOPHER R. WAINWRIGHT,** in his individual and official capacity, an adult individual resident of Canton, Oxford County, State of Maine,<br><br>And<br><br>**JAMES H. URQUHART,** in his individual and official capacity, an adult individual resident of Greene, Androscoggin County, State of Maine,<br><br>    Defendants | **COMPLAINT** |

NOW COMES Plaintiff, Joan M. Kelly, by and through undersigned counsel and hereby complains against Defendants as follows:

1. Joan M. Kelly (hereinafter referred to as "Joan" or "Plaintiff") is an adult individual resident of Hartford, Oxford County, State of Maine.

2. Oxford County is a County in the State of Maine.

3. Oxford County Sheriff's Office is an agency in South Paris, Oxford County, State of Maine.

Oxford County Courts
AUG 1 7 2022
Consolidated Clerks Office

4. Christopher R. Wainwright (hereinafter referred to as "Wainwright" or "Sheriff") is an adult individual resident of Canton, Oxford County, State of Maine.

5. James H. Urquhart (hereinafter referred to as "Urquhart" or "Chief") is an adult individual resident of Greene, Androscoggin County, State of Maine.

6. Joan worked at the Oxford County Sheriff's Office as the Sheriff's Clerk beginning in April of 2018.

7. By the admission of her employer, Joan did excellent work and, prior to December of 2019, there were no complaints whatsoever with respect to her job performance.

8. As also acknowledged by her employer, Joan is straightforward, honest, and forthright in expressing her opinions. Moreover, as a resident of Oxford County, Joan has been involved and active in promoting Government transparency, accountability, and better employee policy.

9. Oxford County Commissioners meetings transpire during the work day. Joan would often clock out of work to attend the public portion of these meetings. She informed her supervisor, assured she had office coverage, and remained fully available if she was needed.

10. Over the course of her employment, it became clear that Joan's attendance of Commissioner's meetings, and her willingness to address issues with the operation of the Office, including with respect to the unequal treatment of employees, and ostensible cover up of employee misconduct, concerned the Sheriff. On multiple occasions the Sheriff addressed Joan's attendance of Commissioners' meetings with multiple individuals (but not Joan) including the Chief. The Sheriff tried to find a way that he could prevent Joan from attending Commissioners meetings, but the Chief informed him that given the circumstances there was nothing they could do.

11. On December 6, 2019, after numerous attempts to have the Sheriff attend to a pressing issue with a member of the public, to which he failed to attend, Joan inquired to the Sheriff whether he "does anything?"

12. The Sheriff was very angry. He pointed at Joan and then next to himself as to beckon her. He raised his voice and said "in my office now!"

13. Joan then requested that the Chief also be present in the office. They briefly discussed the issue that had upset Joan. And the Sheriff, without equivocation, indicated that he thought Joan was toxic and he was going to terminate her. Joan then left the office. She returned to finishing her tasks and went to the Chief's office to ask if the Sheriff was indeed going to terminate her. The Chief said that the Sheriff was going to terminate her. Joan then went to the Commissioner's Office to inform the administrative assistant what had transpired.

14. On December 9, 2019, Joan came to work. The Sheriff said that he needed to see Joan in his office. Joan said she was not comfortable without someone else present. The Sheriff indicated that they would wait for the Chief. Upon the Chief's arrival, they met in the Sheriff's office. The Sheriff told Joan he was placing her on administrative leave and recommending she be terminated. At the Sheriff's direction, the Chief escorted her out of the building. Ultimately, Joan received notice of the scheduling of a termination hearing with the County Commissioners.

15. The hearing, after some schedule adjustments, was ultimately held by the Commissioners on January 30, 2020 and continued on February 6, 2020. Prior to that hearing, however, Joan was provided an opportunity to meet with Chief Urquhart on January 13, 2020. The Chief indicated that the meeting was a *Loudermill* meeting that he thought would take place

in front of the Commissioners, but was instead happening with him that day. He indicated that he would be recording the meeting.[1]

16. During this meeting the Chief indicated that he did not believe the confrontation between Joan and the Sheriff rose to the level of a "one and done fireable offense." He also told Joan that when the Sheriff inquired, the Chief had told him "I don't think it's there," with respect to a sufficient basis to terminate Joan. The Chief also indicated he believed that she was being terminated because of a "personality issue."

17. The Chief also acknowledged that he himself, and other male employees in the Office had similar confrontations with the Sheriff and had not been disciplined. The Chief also inquired whether Joan really wanted to come back and work there, intimating that she would be stressed every day looking behind her back to see if the Sheriff would be trying to find something wrong in her performance.

18. Ultimately, a termination hearing took place in front of the Oxford County Commissioners in an Executive Session. A recording of that hearing was taken by the County, who was represented by Attorney James Pross. Counsel for Joan, Adam R. Lee, expressly requested that recording be maintained. The hearing was conducted to determine whether there was just cause to terminate Joan.[2]

---

[1] In order to maintain her own record, and upon indication that the Chief considered the meeting a replacement for the hearing with the Commissioners, Joan also recorded the meeting on her phone. Ultimately, the Chief, despite indicating he was recording the meeting, did not maintain a recording of the meeting. Joan's is therefore the only existing recording of the meeting.

[2] Annalee Rosenblatt, who is not a County employee, yet has provided inaccurate HR advice about the process both to Joan and to the Sheriff's Office, participated (over Counsel's objection) in the hearing and provided advice on an ongoing basis including writing down questions and arguments for the Sheriff.

19. During the hearing, at risk to Joan's employment, both the Chief and the Sheriff provided defamatory testimony that directly contradicted representations the Chief had made at the recorded January 13, 2020 meeting.

20. While the Chief and Sheriff acknowledged that similar "insubordination" had occurred with other male employees, they contended that insubordination was more acceptable and did not merit any discipline while insubordination, as expressed by Joan, not only merited discipline, but termination.

21. While the Commissioners agreed that Joan should be held to a different standard than her male colleagues, they ultimately found that her actions did not rise to the level of a "fireable" offense and found that there was no just cause for her termination. Accordingly, they determined she should be reinstated in her position and return to work. The Commissioners publicly confirmed their findings and decision on February 18, 2020.

22. Subsequently, the Sheriff sought to do what he was not able to do through the legal statutory process, by delaying and materially and adversely altering the terms of her employment, thereby constructively terminating Joan.

23. After the Commissioners' decision, the Sheriff indicated that Joan would be able to return to work on March 9, 2020. On March 11, 2020, the Chief emailed Joan to request a meeting on March 19, 2020 to review discipline that the Sheriff would take as an alternative to termination, as well as "job expectations" and Sheriff's Office procedures.

24. On March 19, 2020, Joan met at the Commissioners' Office with Annalee Rosenblatt, the non-county employee outside HR advisor who had advised the Sheriff during the termination hearing, and Chief Urquhart who had provided contradictory testimony at the termination hearing. Rosenblatt and Urquhart provided Joan with a disciplinary notice indicating

that she would be suspended for a week without pay from March 23 to March 27, 2020, and that she would "serve a six month probationary period."

25.  At the March 19, 2020 meeting, Joan inquired as to whom she should direct departmental issues and her concerns with regard to violations of the law. She was told her concerns should be directed to the HR Consultant, Rosenblatt. When Joan expressed those concerns to Rosenblatt and pleaded with her to address the issues in the Sheriff's Office, Rosenblatt told Joan that the real issue is that she is "over-qualified" for her position, and that Joan should either file a lawsuit or deal with Sheriff's Office on his terms because he is an elected official.

26.  The County also provided a Performance Improvement Plan which reached far beyond the issues for which she was being disciplined. It stressed the need for her to "understand that the Sheriff and Chief Deputy are your supervisors and as such deserve your loyalty and support." As a means of freezing her ability to participate in County Commissioner meetings it also provided that she must "[o]btain permission and work within common practice and procedures for leaving work during the day." Inexplicably, it also required that she "[i]nvestigate requests for information that fall within the scope of your duties," this was for the goal to "[a]ssure that the requests have been addressed working with the scope of your duties. Before responding, make sure you have all the correct information." However, it also provided that "[m]eetings with the Sheriff will be done by making an appointment noting the subject of your meeting." There were many errors in the documents, and they contained arbitrary discipline having nothing to do with the actions that had allegedly given rise to the termination hearing.

27.  On March 27, 2020, three days prior to the March 30, 2020 return date she had been informed of at the March 19, 2020 meeting, Chief Urquhart sent Joan an email saying not

to return to work on March 30, 2020. By this point, Joan still had not received the updated documents from Rosenblatt that she had been promised. It is understood that the stated basis for not having Joan return at this point was Covid-19. This excuse does not make sense as, while not open to the public, no other Sheriff office employee had been ordered to stay out of work as a result of Covid-19.

28. On April 15, 2020, having not heard anything from the Office, Joan emailed Rosenblatt, Urquhart and the Sheriff. Nobody responded to Joan's email until April 23, 2020, at which point Rosenblatt responded blaming computer issues for her slow response and requested another meeting.

29. On April 29, 2020, Joan met with Rosenblatt. The Sheriff's office was supposed to provide documents for review at the meeting, but they were not provided. Rosenblatt told Joan she was there because she and Commissioner Turner wanted Joan there and to return to work on May 4, 2020. She also stated that there would be an agenda item for the May 7, 2020 Commissioners meeting asking the Sheriff why Joan had been out of work so long.

30. On May 4, 2020, Joan was scheduled to come into the Sheriff's Office at 8:30 AM. It was moved to 11 AM. Upon arrival, Joan was provided the PIP and disciplinary notice, which had not been updated along with the 19 Sheriff office policies for her review. The Chief said he would still need to discuss everything with the Sheriff and have him sign off before Joan could return. The Chief indicated that he would be out of the office until Friday and unable to discuss with the Sheriff. The Chief refused to provide a specific date for return. At the end of the meeting, Rosenblatt inquired if Joan had been at the CID building after their April 29, 2020 meeting. It is understood the Sheriff had seen Joan's car while she was visiting with Lt. Brown, called Rosenblatt and informed her that Joan was not permitted in the building. This is

inconsistent with the information Joan had been provided that she was indeed permitted to be in the building.

31. In the interim, Joan was told that prior to returning she needed to be fitted for an N-95 mask. Upon information and belief, individuals in the office were not wearing N-95 masks. Nevertheless, Joan filled out preliminary paperwork for the fitting which she dropped at Concentra. On or about May 13, 2020, Joan indicated she had reviewed all Sheriff's Dept. policies (as requested) and was ready to be fitted for a mask to make a May 18, 2020 return. She texted (as requested) Deputy Nelson to find out when she could be fitted for the mask. Nelson texted back "There is going to be a lot of people here for police week. When do you come back?" Joan texted back "Excellent question. I think May 18, but nothing confirmed. I will wait for a message from Chief or Annalee and let you know." Nelson responded "Let's shoot for that week." On May 14, 2020, the Chief emailed her a schedule for her return on May 18th and copies of the Disciplinary Notice and Performance Plan she was supposed to sign to return to work. These documents failed to incorporate input that Joan has provided several times to Rosenblatt for accuracy. They also continued to contain elements that had nothing to do with the matters for which she was disciplined, fundamentally altered her job status, and precluded her from participating in public meetings.

32. On May 21, Joan -- who was anxious and suffering from several substantial concerns about continuing to work in a Sheriff's office where her direct supervisor had lied under oath about a conversation he had with her in order to justify her termination, and where the Sheriff made it clear that he wanted her fired and planned to get rid of her no matter what -- returned to work at the Sheriff's Office with every intention of trying to give it her all at a job she loved and at which she was excellent. Present at the meeting were Annallee Rosenbladt, the

Sheriff, and the Chief Deputy. Joan was presented a folder. Joan was not provided these documents prior to the meeting, because the Chief had said he wanted to make sure they were correct and that everyone received the documents at the same time.

33.  The first document they discussed was the job description, which was the incorrect document, but Annalee said it was fine because Joan had been previously given the correct one. The second document was the discipline notice signed by the Sheriff and presented to Joan for her signature. The information – which Joan had discussed with the Chief and Anallee previously – in that document was inaccurate. Finally, Joan was provided a written cover letter about the Performance Improvement Plan and the Plan, to which changes had been made. The probationary period, as explained to Joan, could result in termination any time within the six month period without issuance of another warning.

34.  Joan discussed the policies of the Sheriff's office with Annallee, the Chief and the Sheriff. Joan asked whether the policies cover all employees of the office. Joan pointed out that with respect to the policies she was alleged to have violated, the Sheriff had been discourteous to her, and that the Chief had been untruthful in his testimony at the hearing. Joan was told that the meeting was about her and nobody else, and Annalee indicated that the policies are within the sole discretion of the Sheriff as to how he enforces them. She went on to say that because he is a salaried employee, the policies don't apply to him. She said he doesn't need to say when he is taking vacation or sick time. She then said that if Joan had an issue with the way the policy was enforced, Joan could take it to the "next level" which Annalee indicated was herself. Joan then noted that she had already done that, and was presently doing it at that very moment.

35.  When Joan asked questions or raised issues with the documents, she was told that the meeting was not an opportunity for her to "parse words" or "critique language," Joan stated

9

that if she was going to sign off on things, she needed to understand what she was signing off to. Joan said to the Sheriff that it was a shame that they couldn't have aired their differences and moved on, rather than taking things to the extreme he was, by altering her job and enabling himself to terminate her without any oversight. He shrugged his shoulders and smirked. By contrast, the one male employee who was a member of support staff, had suggested that the policies should be altered so as to not preclude "digital recording." In this instance his concerns were not considered "parsing words" or "critiquing language" and were incorporated into the policies.

36. Joan left the main office and went to her own office to collect her personal items. Understanding that she would not have any ability to recover from the disciplinary action, and that the Sheriff fully intended to circumvent all procedures and process so as to enable himself to terminate her, she called Abby in the Commissioners' office to let her know that she was resigning. Joan then met with Abby and Tom Winsor, the County Administrator, to explain why she was leaving and provided her resignation letter. Abby indicated that the Sheriff's interpretation of the probationary policy was wrong. Tom indicated that Annalee had stated that the Sheriff had been the one who had blocked the several return dates that were repeatedly moved. Joan was tremendously hurt and upset, and explained that she couldn't finish an exit interview at that time. She provided her resignation letter to the Chief and left. She subsequently completed an exit interview.

37. As revealed in the Sheriff's treatment of Joan, and as justified at the hearing by the Sheriff, the Chief, the County's attorney, and by the County Commissioners, in Oxford County, the County's policies regarding conduct and respect for one's superiors apply to the support staff (who are all women, with the exception of one male IT support staffer) but do not

apply to the law enforcement officers (who are all men). This is demonstrated by at least two examples:

    A.    On or about May 9, 2019, Chief Urquhart loudly confronted Sheriff Wainright in the Sheriff's Office. The administrative assistant, Deanna Petrie, and presumably anyone else present in the common areas could hear the confrontation. The argument was in response to the Sheriff covering up an accident that had taken place in a county cruiser. This argument ended in the Chief walking off the job, indicating that he could not return, and criticizing the Sheriff to several other subordinate employees. The Chief returned, and was in no way disciplined for his insubordination, his conduct, or for any other reason.

    B.    On or about November 6, 2019, Lt. Chancey Libby loudly confronted the Sheriff in front of the Chief and Lt. Brown. Libby left the meeting and walked off the job. He later sent several incendiary emails and text messages so insubordinate that they led to the Sheriff shutting down Libby's email account. On or about November 8, 2019, Libby told Joan that he anticipated he would be disciplined for the way he had confronted the Sheriff. He was not, and was surprised that he was not.

    38.    In addition to the admittedly different treatment of male employees from female employees, and perhaps in harmony with it, the Sheriff was seeking to terminate Joan because of her attempts to bring sunlight to several issues in the Sheriff's Office and county writ large. This is evident in the Sheriff's repeated questions about the appropriateness of Joan, who is an Oxford County resident, attending Commissioners meeting on her own time to talk about County issues. Subsequent to his failed attempt to terminate her, it was revealed in his laundry list of changes – wholly unrelated to the December 6, 2019 confrontation for which she was being purportedly disciplined – he wanted Joan to abide. This included that she would cease recording

conversations, a direct consequence of her ability to reveal that the Chief's testimony at her termination hearing was false. It also included that she was required to obtain permission to leave during the work day. Notwithstanding that this was something she was already doing, the attempt to limit her ability to do this "during the work day" when the Commissoners meet, was an obvious example of the Sheriff's desire to enact through a PIP responsive to discipline what he knew he couldn't – because both the Chief and Commissioners told him he couldn't – do to Joan under regular circumstances: prevent her from participating in Commissioners meetings. He doubled down on this through another component of the PIP which would have had Joan discontinue discussion outside the Office regarding Office business. Joan never violated this policy, nor did it have anything to do with the matter for which she was disciplined, it was another effort to chill Joan's speech and her participation in Commissioners meetings.

39.     Additionally, the delay tactics used by the Sheriff in returning Joan to work were directly intended to further demonstrate how unwelcome her return was. It was also meant to isolate Joan from her co-workers and foment the destruction of her reputation with her colleagues. The variety of reasons constructed for the delays were obviously pre-textual. That they were pre-textual was revealed by conversations she had with Ms. Rosenblatt and with Mr. Winsor, both of whom indicated that it was the Sheriff who was blocking Joan's return. Use of the pandemic as pre-text is of itself unseemly. But it is also demonstrably baseless. It is inconsistent with how every other employee within the Office was treated. Moreover, during the March 19 meeting, during which the civil department had already been shut down, there was no discussion that Joan's primary job responsibilities would suddenly become civil process. The Sheriff's office remained open to the public, and no Sheriff's Office personnel were told not to return to work. If Covid was the reason for delay, why was it not mentioned at the March 19

meeting? Covid became a convenient reason for the Sheriff to push Joan's return out even further.

40. Joan brought up the existence of misconduct within the Sheriff's office on several occasions. Specifically, Joan met with Ms. Rosenblatt on November 4, 2019 in the small meeting room outside the Commissioners' office. Ms. Rosenblatt was purportedly investigating a complaint she had received regarding unbecoming co-worker conduct. Joan explained the multiple issues that were going on in the Sheriff's Office that were concerning. This included inappropriate workplace behavior and activities that Joan considered to be unlawful. On November 7, 2019 there had been a public Commissioners' meeting regarding Sgt. Davis grievance. During that meeting the Commissioners voted to pay the balance of sick time to Sgt. Davis despite the "unconventional" handling of Davis' departure. During that same meeting, Ms. Rosenblatt explained how the Sheriff had edited the resignation letter written by Sgt. Davis. During that meeting, Joan had asked the Commissioners if they were comfortable with the actions taken by the Sheriff. They responded that they were. The next day, Ms. Rosenblatt again asked Joan to meet with her. Joan met again with Ms. Rosenblatt on November 8, 2019 in the Commissioner's meeting room to discuss further concerns including Sgt. Davis' crash and the cover-up of that crash by the Sheriff.

41. Plaintiff has exhausted all administrative remedies for purpose of this claim.

## COUNT I – SEX DISCRIMINATION PURSUANT TO MAINE HUMAN RIGHTS ACT 5 M.R.S. § 4572(1)(A)
(Against Defendants Oxford County and Oxford County Sheriff's Office)

42. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 40 of her Complaint as if fully set forth herein.

43. Plaintiff is a woman.

44. Defendants' actions against Plaintiff constitute discriminatory actions against Plaintiff in her employment because of her sex.

45. As a result of Defendants' discriminatory actions, Plaintiff has been damaged.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and declare that the conduct engaged in by Defendants is a violation of the Plaintiff's rights under the Maine Human Rights Act, order Defendants to award Plaintiff back and front pay, award Plaintiff compensatory and punitive damages in an amount to be determined at trial of this matter, award Plaintiff's attorney's fees, including legal expenses and costs, award Plaintiff prejudgment interest and grant Plaintiff such other and further relief as the Court deems just and proper.

## COUNT II – MAINE WHISTLEBLOWER PROTECTION ACT, 26 M.R.S. § 833, et seq.
**(Against Defendants Oxford County and Oxford County Sheriff's Office)**

46. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 44 of her Complaint as if fully set forth herein.

47. Plaintiff acting in good faith made oral and written reports to both her employer and to the Oxford County Commissioners what she believed to be violations of the law and/or actions by the Oxford County Sheriff and his Office that resulted in risks to the health and safety of individuals.

48. As a result of her reports, Defendants constructively discharged and otherwise discriminated against Plaintiff regarding her compensation, terms, conditions, and privileges of her employment.

49. As a result of Defendants' discriminatory actions, Plaintiff has been damaged.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and declare that the conduct engaged in by Defendants is in violation of Plaintiff's rights under the Maine

Whistleblower Protection Act, order Defendants to award Plaintiff back and front pay, award Plaintiff compensatory and punitive damages in an amount to be determined at trial of this matter, award Plaintiff's attorney's fees, including legal expenses and costs, award Plaintiff prejudgment interest and grant Plaintiff such other and further relief as this Court deems just and proper.

## COUNT III – VIOLATION OF THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION
### (Against All Defendants)

50. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 49 of her Complaint as if fully set forth herein.

51. As a resident of the County of Oxford, Plaintiff had a right pursuant to the First Amendment of the United States Constitution to engage in free speech on matters of public importance. As a result of her expression of free speech on such matters, Defendants took adverse employment actions, including constructive discharge against her, and a motivating factor for the adverse employment actions was her decision to engage in that speech.

52. Defendants' actions were under color of State law.

53. Defendants' actions were a result of policy and custom of the County and/or the Sheriff's Office.

WHEREFORE, Plaintiff prays for judgment as follows: (a) an award of compensatory damages against Defendants in an amount to be determined at trial; (b) an award of punitive damages against Defendants in an amount to be determined at trial; (c) an award of Plaintiff's costs and reasonable attorney's fees in this action pursuant to 42 U.S.C. §§ 1983 and 1988; (d) appropriate injunctive relief, including the implementation of training protocols to prevent and

effectively discipline the conduct complained of herein; and (e) an order granting such other and further relief as the Court deems just and proper, including without limitation, nominal damages.

## COUNT IV – VIOLATION OF THE 14TH AMENDMENT OF THE UNITED STATES CONSTITUTION (EQUAL PROTECTION AND DUE PROCESS)
(Against all Defendants)

54. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 53 of her Complaint as if fully set forth herein.

55. Joan is a woman.

56. At all times relevant hereto, Plaintiff had rights clearly established under the 14th Amendment of the United States Constitution enforceable against the states through the due process clause of the 14th Amendment to equal protections under the laws.

57. Defendants admittedly took adverse employment actions and applied Sheriff's Office policies in a discriminatory and unequal manner against Plaintiff on the basis of her sex thereby denying her equal protection under the law.

58. Plaintiff suffered damages, including economic and non-economic injuries as a consequence of these violations.

59. Defendants' actions violated clearly established statutory and constitutional rights which a reasonable person should have known, including under the above stated constitutional amendments.

60. Moreover, Defendants had a duty to intervene to prevent a violation of these rights, had a reasonable opportunity to intervene, yet failed to intervene.

61. Defendants' actions were under color of State law.

62. Defendants' actions were a result of policy and custom of the County and/or the Sheriff's Office.

63. Moreover, through their adverse employment actions against Plaintiff, Defendants' actions were with deliberate indifference.

64. Defendants' actions were with malice or so outrageous that malice can be implied and as a result, Plaintiff is entitled to punitive damages.

65. Defendants' actions also violated Plaintiff's rights under 30-A M.R.S. § 501, *et seq.* that she should not be dismissed, suspended or otherwise disciplined except for cause and with the approval of the County Commissioners.

66. Defendants' actions sought to remove this due process right, and ostensibly change the circumstances of her employment so as to preclude her due process rights.

WHEREFORE, Plaintiff prays for judgment as follows: (a) an award of compensatory damages against Defendants in an amount to be determined at trial; (b) an award of punitive damages against Defendants in an amount to be determined at trial; (c) an award of Plaintiff's costs and reasonable attorney's fees in this action pursuant to 42 U.S.C. §§ 1983 and 1988; (d) appropriate injunctive relief, including the implementation of training protocols to prevent and effectively discipline the conduct complained of herein; and (e) an order granting such other and further relief as the Court deems just and proper, including without limitation, nominal damages.

## COUNT V – DEFAMATION PER SE
### (Against Defendants Wainwright and Urquhart)

67. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 66 of her Complaint as if fully set forth herein.

68. Defendants negligently, recklessly, or intentionally made false statements to individuals other than Plaintiff about Plaintiff's personality, reputation, and her tendency towards truth. Specifically, Defendants have represented to others both inside and outside the Sheriff's Office that Plaintiff's allegations regarding both statements made by Chief Urquhart and

17

statements made to Sheriff Wainwright were false. Specifically, Sheriff Wainwright represented under oath that Joan had sworn at him and had made statements that in fact she did not. Moreover, under oath, Chief Urquhart made statements that were categorically false with respect to representations he had previously made to Joan as to the nature of her behavior and whether it merited termination. These statements were made in a knowingly false manner and with the specific intent of justifying Joan's termination.

69. Defendants' statements have the tendency to injure and have in fact injured Plaintiff and her reputation, occupation, and profession.

70. As a direct and proximate result of Defendants' slander of Plaintiff, Plaintiff has been injured in her occupation and profession, and has incurred mental suffering, humiliation, embarrassment and damage to her reputation and professional standing.

71. As a direct and proximate result of Defendants' slander of Plaintiff, Plaintiff has incurred damages.

WHEREFORE, Plaintiff requests the Court enter judgment in her favor and award compensatory damages, including lost earnings opportunities, mental suffering, humiliation, and embarrassment to her reputation and professional standing, attorney's fees and costs and for such other and further relief as the Court deems just and proper.

## COUNT VI – PUNITIVE DAMAGES
### (Against all Defendants)

72. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 71 of her Complaint as if fully set forth herein.

73. Defendants' actions against Plaintiff were with malice or so outrageous that malice can be implied, and as a result, Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount which will fairly compensate her for her damages as well as punitive damages, and any other relief deemed just in the premises, including an award of Plaintiff's costs and attorney's fees.

Dated: August 17, 2022

Adam R. Lee, Bar No. 4143
*Attorney for Plaintiff*

Trafton, Matzen, Belleau & Frenette
PO Box 470, 10 Minot Avenue
Auburn, Maine 04212-0470
207-784-4531
Alee@tmbf-law.com