## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| JOAN M. KELLY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Docket No. 2:22-cv-00339-LEW |
| ) | |
| OXFORD COUNTY, et al., ) | |
| ) | |
| Defendants. ) | |

### DEFENDANTS OXFORD COUNTY SHERIFF'S OFFICE AND OXFORD COUNTY'S MOTION FOR SUMMARY JUDGMENT

Defendants Oxford County and the Oxford County Sheriff's Office (hereinafter, the "County Defendants"), by and through undersigned counsel, hereby move pursuant to Federal Rule of Civil Procedure 56 for summary judgment in their favor.  Filed in connection with this motion is the County Defendants' Statement of Uncontested Material Facts ("SMF") pursuant to Local Rule 56(b).

### MEMORANDUM OF LAW

### I.    INTRODUCTION

Kelly's surviving claims are for what she contends were violations of her rights under federal and Maine law. Specifically, she claims that the County Defendants: (1) retaliated against her for her "expression of free speech" on public matters, which violated her First Amendment rights. ECF No. 10 at 18-19, ¶ 58; (2) took adverse employment actions and applied Sheriff's Office policies in a discriminatory manner which violated her equal protection rights under the Fourteenth Amendment of the U.S. Constitution. ECF No. 10 at 20, ¶ 64; (3) subjected her to unlawful employment discrimination because she is a woman, in violation of the Maine Human

Rights Act ("MHRA"), 5 M.R.S. § 4572(1)(A). ECF No. 10 at 17, ¶¶ 50-51; and (4) retaliated against her in violation of Maine's Whistleblower Protection Act, 26 M.R.S. § 833(1)(A).

## II.    FACTUAL BACKGROUND

Kelly worked as the Sheriff's Clerk at the Oxford County Sheriff's Office for approximately two years, from April 2018 until her resignation in May 2020. SMF at p. 1, ¶ 1 (ECF No. 10 at p. 2, ¶ 6 and p. 11, ¶ 38). Other than Sheriff Christopher Wainwright, Kelly reported to Chief Deputy James Urquhart, who was junior in rank only to the Sheriff. SMF at 1, ¶ 2 (ECF No. 37-1 at 68); SMF at p. 6, ¶ 35 (ECF No. 37-1 at 26). Kelly also served in a support role for other certified law enforcement officers in the Sheriff's Office, including Lieutenant Chancey Libby, a detective in the criminal investigation division ("CID") of the Sheriff's Office. SMF at p. 6, ¶ 40 (ECF No. 37-1 at 26).

On the morning of Tuesday, May 7, 2019, Chief Deputy Urquhart informed Kelly about an automobile accident involving a police cruiser driven by an Oxford County Sheriff's Deputy named Sergeant Chris Davis. SMF at p. 1, ¶ 3 (ECF No. 10 at 14-15, ¶ 42). As part of his investigation into the accident, Chief Deputy Urquhart asked Kelly to assemble a photo lineup of six people who worked in the Sheriff's Office, which was later used in an internal affairs report concerning the crash. SMF at p. 1, ¶ 4 (ECF No. 37-1 at 35) and p. 2, ¶ 6 (ECF No. 10 at 15, ¶ 42). Kelly continued to have ongoing discussions with Urquhart about the Davis crash and its investigation from May through August 2019. SMF at p. 1, ¶ 5 (ECF No. 37-1 at 72).

Several days after Urquhart told Kelly about the Davis crash, she asserts that he and Wainwright had a loud argument in Wainwright's office about the Davis car crash. SMF at p. 5, ¶ 30 (ECF No. 10 at 12, ¶ 39A). Kelly also claims that the argument ended with Urquhart walking off the job, although he returned to work shortly thereafter without facing any discipline as a result

of the argument. SMF at p. 5, ¶¶ 31, 32 (ECF No. 10 at 12, ¶¶ 39A, 39B). Kelly also claims that, roughly six months later, on November 6, 2019, Lieutenant Libby had loud argument with Wainwright about who would run the CID. SMF at p. 5, ¶ 33 (ECF No. 10 at 12, ¶ 39B). Kelly maintains that Libby, like Urquhart, returned to work without facing any discipline as a result of his argument with Wainwright. SMF at p. 5, ¶ 34 (ECF No. 10 at 12-13, ¶ 39B).

In July 2019, as part of an investigation into the Davis car crash, the Oxford County Commissioners asked Kelly to meet with an investigator named John Goodman. SMF at p. 2, ¶ 7 (ECF No. 37-1 at 72). Kelly met with Goodman shortly thereafter and conveyed what she knew of the Davis affair to him. *Id.* After their discussion ended, Kelly remained in the room and Annalee Rosenblatt, a human resources consultant for Oxford County, entered and began discussing the Davis crash with Kelly. SMF at p. 2, ¶ 8 (ECF No. 37-1 at 72). Among the things that they discussed, Rosenblatt wanted to know where Davis had driven the police cruiser and when, and she asked Kelly to investigate. SMF at 2, ¶ 9 (ECF No. 37-1 at 72). Kelly and Rosenblatt had another conversation about the Davis car crash and investigation on November 4, 2019, at which Kelly expressed her dissatisfaction about the investigation into the Davis car crash and asked Rosenblatt why the Commissioners were reluctant to go public. SMF at p.2, ¶¶ 10, 11 (ECF No. 37-1 at 72). Kelly and Rosenblatt also discussed unspecified inappropriate speech that Kelly said she had witnessed in the Sheriff's Office, with Kelly telling Rosenblatt that she would tell people when she found speech to be inappropriate.  SMF at p. 3, ¶¶ 12, 13 (ECF No. 37-1 at 72).

Several days after Rosenblatt's and Kelly's conversation, on November 7, the Oxford County Commissioners held a public meeting at which they addressed a grievance filed by Sergeant Davis concerning the payment of the balance of his sick leave after his resignation. SMF at p. 3, ¶ 15 (ECF No. 37-1 at 72). Rosenblatt spoke at the meeting and explained some of the

circumstances of Davis' resignation, including the fact that Sheriff Wainwright had edited Davis' resignation letter to change the date. SMF at p. 3, ¶ 17 (ECF No. 37-5 at 4). The Commissioners then voted to accept Davis's resignation and to pay the balance of his sick time upon his resignation from the Sheriff's Office. SMF at p. 3, ¶ 16 (ECF No. 10 at 15, ¶ 43). Either shortly before or shortly after their vote, Kelly spoke and asked the Commissioners, "knowing what you know, are you comfortable allowing this payout to be made?" SMF at p. 4, ¶ 18 (ECF No. 37-1 at 73). The Commissioners all answered Kelly's question in the affirmative. SMF at p. 4, ¶ 19 (ECF No. 37-1 at 73).

The next day, November 8, Kelly met with Rosenblatt again to discuss the Commissioners' meeting that had just taken place. SMF at p. 4, ¶ 20 (ECF No. 37-1 at 73). Kelly and Rosenblatt also spoke further about  unidentified "issues" within the Sheriff's Office. SMF at p. 4, ¶ 21 (ECF No. 37-1 at 73).

The Commissioners held another public meeting on Tuesday, November 19, 2019, which Kelly also attended. SMF at p. 4, ¶ 23 (ECF No. 37-4 at 1). Kelly asked the Commissioners for an update on the Davis investigation, and Commissioner David Duguay responded by telling Kelly that, although the investigation itself was essentially finished, the final document had not been completed and would need to be redacted for public review before it could be released. SMF at p. 4, ¶¶ 23, 24 (ECF No. 37-4 at 1). Kelly also asked the Commissioners for a copy of Oxford County's contract for labor consulting services and asked whether it had ever been discussed to use an attorney for such services instead. SMF at p. 4, ¶ 25 (ECF No. 37-4 at 1). County Administrator Tom Winsor told Kelly that no a written contract was in place. SMF at p. 4, ¶ 26 (ECF No. 37-4 at 1).

On December 6, 2019, Kelly engaged in an insubordinate outburst at Sheriff Wainwright when, in a frustrated moment, she asked him "do you ever do anything?" SMF at p. 6, ¶ 42 (ECF No. 37-1 at 9-10). When Wainwright responded to Kelly's comment by telling her to get in his office, she told him to "bring it," then said that he did not deserve her respect and that he was toxic to the Sheriff's Office. SMF at pp. 6-7, ¶ 43 (ECF No. 37-1 at 9-10, 12). Kelly admits that her tone during the interaction was disrespectful and unprofessional. SMF at p. 7, ¶ 44 (ECF No. 37-1 at 12).

Three days after her outburst at Wainwright, he informed Kelly that he was placing her on paid administrative leave and recommending that her employment be terminated. SMF at p. 7, ¶ 46 (ECF No. 10 at 3, ¶ 14). The Commissioners held a hearing concerning Wainwright's recommendation over the course of two days, January 30 and February 6, 2020. SMF at p. 7, ¶ 47 (ECF No. 37-1 at 73). Kelly contends that Wainwright and Urquhart provided false and defamatory testimony in an attempt to convince the Commissioners to accept Wainwright's recommendation. SMF at p. 7, ¶ 48 (ECF No. 37-1 at 73; ECF No. 10 at 5, ¶ 19). At the conclusion of Kelly's termination hearing, the Commissioners voted not to terminate her employment. SMF at p. 7, ¶ 49 (ECF No. 10 at 6, ¶ 23). A short time later, Wainwright told Kelly that she would be able to return to work on March 9, 2020. SMF at p. 7, ¶ 50 (ECF No. 10 at 6, ¶ 25). However, Kelly's return to work was repeatedly delayed and her return date of March 9, 2020, was pushed back to March 19, then March 27, March 30, April 29, May 4, May 18, and May 21. SMF at p. 8, ¶ 54 (ECF No. 37-1 at 73).

On March 19, 2020, Kelly met with Urquhart and Rosenblatt, who provided Kelly with a disciplinary notice stating that she would be suspended for one week without pay and that she would serve a six-month probationary period. SMF at p. 8, ¶ 51 (ECF No. 10 at 6, ¶ 26). Around

the same time, Kelly was also provided with a Performance Improvement Plan ("PIP"). SMF at p.

8, ¶ 52 (ECF No. 10 at 7, ¶ 28). The PIP consited of eight items that would have required Kelly

to: (1) participate in on-boarding training to review County and Departmental policies that applied

to her; (2) review scope of her job description and to work within that description; (3) respond

professionally, positively, and appropriately to the Sheriff, Chief Deputy, and co-workers; (4)

obtain permission and work within common practice and procedures for leaving work during the

work day; (5) investigate requests for information that fall within the scope of her duties before

responding to inquiries; (6) schedule meetings with the Sheriff and note the subject of your

meeting; (7) present a task list of work performed in general to the Chief Deputy each week; and

(8) direct any questions about her employment to Chief Deputy Urquhart or Annalee Rosenblatt.

SMF at p. 8, ¶ 53 (ECF No. 37-1 at 157–158).

During her absence from the Sheriff's Office, Kelly exchanged multiple emails with

Urquhart and Rosenblatt from February 18, 2020, to May 21, 2020, in which she requested

revisions to her PIP and other documents associated with her return to work. SMF at p. 8, ¶ 55

(ECF No. 37-1 at 18) and SMF at p. 9, ¶ 56 (ECF No. 37-1 at 18-21).  For example, on May 15,

2020, Kelly emailed Wainwright, Urquhart, and Annalee Rosenblatt to express her "observations

of the documents sent" (i.e., her disciplinary notice and PIP), and complained that items were "not

stated in a way that makes sense, grammatically" and that another item was "incorrect in its

premise." SMF at p. 9, ¶ 57 (ECF No. 37-1 at 166-67). Kelly also accused Wainwright, Urquhart,

and Rosenblatt of an "explicit attempt to keep me from attending the Commissioners meetings."

SMF at p. 9, ¶ 58 (ECF No. 37-1 at 166-67). In another email dated May 19, 2020, Kelly sharply

questioned delays to her return to work. SMF at p. 9, ¶ 59 (ECF No. 37-1 at 169) ("Are the

documents being updated or was this yet another excuse used to postpone my returning to work? I see it as a simple yes or no answer, please provide me with that answer.").

Kelly met with Urquhart and Rosenblatt a second time upon her return to work for her on-boarding meeting on May 21, 2020. SMF at p. 9, ¶ 60 (ECF No. 10 at 11, ¶ 38). Urquhart and Rosenblatt reviewed each document in detail with Kelly, one at a time, rather than give her a pile of documents to sign all at once. SMF at p. 10, ¶ 63 (ECF No. 37-1 at 38). However, Kelly found that the PIP and other documents were not corrected to her satisfaction. SMF at p. 9, ¶ 61 (ECF No. 37-1 at 37) (Q: "So basically you were going in, if they've corrected the documents and if the position is as I believe it should be, then I'll stay but if not, I won't?" A: "Correct."). Specifically, Kelly objected to being suspended, claimed that her job description was inaccurate, and had objections to multiple other, unspecified office policies. SMF at p. 10, ¶ 62 (ECF No. 37-1 at 37) ("[T]he document where they put me on suspension, that was in there, again I stated my objections. The job description I pointed out this is still incorrect . . . and then as we went through all the list of the policies, procedures, I gave them different objections that I had within those policies as far as like what I saw could be problematic[.]").

Although Kelly claims to have been dissatisfied with the documents, she nonetheless reviewed and signed them one by one.  SMF at p. 10, ¶ 64 (ECF No. 37-1 at 38).  This is true despite the fact that she later admitted that she had already decided to resign her position two days prior and had already drafted her resignation letter, which she had with her. SMF at p. 10, ¶¶ 63-65 (ECF No. 37-1 at 37-38). Thus, after the conclusion of the on-boarding meeting, and despite the fact that she had reviewed and signed each document that Urquhart and Rosenblatt presented to her, Kelly went to her office, collected her personal items, and then handed in her pre-penned resignation at the Commissioners' Office. SMF at p. 10, ¶ 66 (ECF No. 37-1 at 25).

### III.   LEGAL ANALYSIS

#### A.   Federal Claims

##### 1.   First Amendment Retaliation

Count III of Kelly's First Amended Complaint alleges that the Defendants took adverse employment actions against her because of her "expression of free speech" on public matters, which violated her First Amendment rights. ECF No. 10 at 18-19, ¶ 58. Aside from her vague allegations that she made "attempts to bring sunlight to several issues in the Sheriff's Office and county writ large," *id.* at 13, ¶ 40, Kelly's specific allegations can be boiled down to two issues: (1) the automobile accident involving Sergeant Davis and its subsequent investigation, and (2) alleged "unequal treatment of employees. *Id.* at 2, ¶ 10 and 14-15, ¶¶ 42-47. Kelly claims that she spoke out about the Davis car crash to the Oxford County Commissioners at their public meetings and spoke out about the Davis crash and other issues in her meetings with Rosenblatt. She brings this claim pursuant to 42 U.S.C. § 1983. *Id.* at 19.

In order to prevail on a claim of First Amendment retaliation, Kelly must demonstrate that she spoke out as a private citizen on a matter of public concern and that her speech was a substantial or motivating factor in a subsequent adverse employment consequence. *Gutwill v. City of Framingham, Mass.,* 995 F.3d 6, 12 (1st Cir. 2021) (quotation omitted); *Bruce v. Worcester Regional Transit Authority,* 34 F.4th 129, 135 (1st Cir. 2022). An adverse employment consequence is "an action the employer takes that would deter a reasonably hardy individual from exercising [her] constitutional rights." *Barton v. Clancy,* 632 F.3d 9, 29 (1st Cir. 2011).

##### (a) Kelly Cannot Demonstrate That She Spoke Out As a Private Citizen.

The First Circuit has identified several factors that help to determine whether a plaintiff spoke as a private citizen. *Decotiis v. Whittemore,* 635 F.3d 22, 32 (1st Cir. 2011). No single factor

is dispositive, but the First Circuit believes them to be instructive. *Id.* These include such factors as: (1) the subject matter of the speech, *id.* (citing *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006)); (2) whether the employee spoke at her place of employment, *id.* (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.,* 492 F.3d 1192, 1205 (10th Cir. 2007); (3) whether the speech was communicated up the chain of command, *Decotiis,* 635 F.3d at 32 (citing *Gilbert v. City of Chicopee,* 915 F.3d 74, 83 (1st Cir. 2019) ("a complaint or concern made up the chain of command is the quintessential example of speech that owes its existence to a public employee's official responsibilities.") (quotation marks omitted); (4) whether the employee's speech derived from special knowledge obtained during the course of her employment, *id.* (citing *Williams v. Dallas Ind. School Dist.,* 480 F.3d 689, 694 (5th Cir. 2007)); and (5) whether there is a "citizen analogue" to Kelly's speech, i.e., whether the speech was analogous to the speech of private citizens, *id.* at 34.[1]

The *Decotiis* factors weigh in favor of concluding that Kelly was speaking out as a public employee rather than a private citizen: the subject matter of her speech concerned county business (i.e., Davis's car crash and his resignation), occurred in the workplace during work hours, was communicated up the chain of command to Rosenblatt, Kelly's HR contact, and involved information that Kelly learned in the course of her job. SMF at p. 2, ¶¶ 8-11 (ECF No. 37-1 at 72). *See also* ECF No. 10 at 14-17, ¶¶ 42, 43, 45, 46, 47. Given that she was participating in the investigation, her speech cannot reasonably be said to have a citizen analogue, since no private citizen would have been meeting privately with Rosenblatt. Furthermore, Kelly's speech fell

---

[1] Other *Decotiis* factors include whether the employee was commissioned or paid to make the speech in question, whether the speech gave objective observers the impression that the employee represented the employer when she spoke, and whether there is "a so-called citizen analogue to the speech." *Decotiis,* 635 F.3d at 32. Neither of these remaining factors appear to apply to the instant case. For example, there is no dispute that the speech at issue here was made "in-house," i.e., even an objective observer would have known that Kelly was not representing the County as she spoke to elected county officials and a county human resources contractor.

within the scope of her duties: she held discussions about the investigation with Rosenblatt and investigated the whereabouts of Davis's cruiser at Rosenblatt's request. SMF at p. 2, ¶¶ 8-10 (ECF No. 37-1 at 72). These facts weigh heavily against concluding that she was speaking as a private citizen. *Lane v. Franks,* 573 U.S. 228, 240 (2014) ("[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").

### (b) Kelly Cannot Establish That She Suffered an Adverse Employment Consequence.

Kelly alleges that she was constructively discharged in retaliation for speaking out on matters of public importance, and that she suffered other adverse employment consequences, including: (i) purportedly false testimony given by Sheriff Wainwright and Chief Deputy Urquhart at her termination hearing, SMF at p. 7, ¶ 48 (ECF No. 37-1 at 73); (ii) delays in her return to the office after her paid suspension, *id.* at p. 8, ¶ 54  (citing ECF No. 37-1 at 73); and (iii) the fact that she was presented with a performance improvement plan ("PIP") prior to her return to work which she asserts would have hindered her ability to "speak out," *id.* at p. 8, ¶ 53 (ECF No. 37-1 at 157–158). The County Defendants anticipate that Kelly will also allege other adverse employment actions in opposition to this motion, including: (iv) Sheriff Wainwright's recommendation that her employment be terminated, and (v) the fact that she was suspended for one week without pay, ECF No. 10 at p. 6, ¶ 25.

These allegations are insufficient to establish First Amendment retaliation because they do not rise to the level of acts which "would deter a reasonably hardy individual from exercising [her] First Amendment rights." *Barton,* 632 F.3d at 29 (1st Cir. 2011).  It takes something akin to "a campaign of informal harassment" in order to give rise to § 1983 liability for First Amendment retaliation. *Id.* Stated differently, to constitute an adverse employment consequence, an employer

must engage in a "campaign of petty harassments directed against a public employee in retaliation for his political beliefs or affiliations." *Pieczynski v. Duffy,* 875 F.2d 1331, 1335-36 (7th Cir.1989) (cited approvingly in *Barton,* 632 F.3d at 30). "Petty harassments" include such acts as confining the plaintiff to monotonous paperwork, terminating her supervisory authority, removing her long-distance telephone line, denying her requests for vacation time, and refusing her requests to change her lunch hour, among other acts. *Id. See also, Manzer v. Town of Anson,* 771 F.Supp.2d 121, 131–32 (D. Me. 2011) (employer "engaged in a campaign of harassment" against town truck drivers by deleting overtime from their timecards and forcing them to work unnecessarily during Selectmen's meetings). As discussed below, Kelly's allegations, even if taken as true, do not meet this standard.

### (i)    Constructive Discharge

Kelly testified that she resigned after she reviewed and signed the documents presented to her at her May 21, 2020, on-boarding meeting with Chief Deputy Urquhart and Annalee Rosenblatt. SMF at p. 10, ¶¶ 63, 64 (ECF No. 37-1 at 38) and ¶ 66 (ECF No. 37-1 at 25). Specifically, Kelly said that, notwithstanding the fact that she had already drafted her resignation letter, SMF at 10, ¶ 65 (ECF No. 37-1 at 37), she objected to being suspended, claimed that her job description was inaccurate, and had objections to multiple other, unspecified office policies. *Id*. at ¶ 62 (ECF No. 37-1 at 37).

This falls short of demonstrating constructive discharge. It is not enough for an employee to demonstrate that she suffered "the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000). In order for a resignation such as Kelly's to constitute a constructive discharge, it must have been "void of choice or free will—[the] only option was to quit." *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134

(1st Cir. 2014) (quotation marks omitted). "[A]n employee is obliged not to assume the worst, and not to jump to conclusions too fast." *Torrech–Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 52 (1st Cir. 2008) (quotation marks omitted). The record does not reflect a situation so stark that Kelly's only choice was to resign. In fact, Kelly's testimony establishes the opposite: she concedes that she spent roughly three months engaging with Urquhart and Rosenblatt via email to fine-tune her PIP and job description prior to her return to work. SMF at p. 8, ¶ 55 (ECF No. 37-1 at 18) and p. 9, ¶¶ 56-57 (ECF No. 37-1 at 18-21, 166-67). This suggests that Kelly was not "void of choice," that her only option was to quit, and therefore, that she was not faced with an adverse employment consequence. *EEOC v. Kohl's Dept. Stores,* 774 F.3d at 134. Moreover, Urquhart's and Rosenblatt's willingness to make changes to Kelly's PIP, job description, and other documents undercuts her claim of constructive discharge because "the evaluation of a constructive discharge claim takes into account how the employer responded to the plaintiff's complaints," *Lee-Crespo,* 354 F.3d at 45.

Additionally, the mere fact that Kelly was presented with a PIP does not demonstrate constructive discharge because "absent exceptional and objectively unbearable circumstances, a corrective performance plan does not present an opportunity to resign and label that resignation a 'constructive discharge.'" *Sullivan*, 2016 ME at ¶ 21.

Finally, the fact that Kelly appeared at her on-boarding meeting on May 21, 2020, carefully reviewed and signed each document one at a time, and then left to collect her belongings and turn in her resignation, SMF at p. 10, ¶¶ 63-65 (ECF No. 37-1 at 38) and ¶ 66 (ECF No. 37-1 at 25), further reflects the fact that Kelly had options that remained open to her even up to the moment before she abandoned the job from which she now claims that she was forced to leave.  Her resignation was a carefully orchestrated and premeditated act, one which she began scheming and

executing with the drafting of her resignation letter days before she attended the onboarding meeting and signed the return to work documentation.  For all that appears, Kelly's participation in the meeting was a sham.   Kelly was most certainly not "void of choice" as she is required to prove. *See EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d  at 134, *supra.*

### (ii)    Performance Improvement Plan

In contrast to the "campaign of petty harassments" that Kelly is required to show, *Pieczynski,* 875 F.2d at 1335-36, Kelly's PIP consisted of eight items that would have required Kelly to: (1) participate in on-boarding training to review County and Departmental policies that applied to her; (2) review scope of her job description and to work within that description; (3) respond professionally, positively, and appropriately to the Sheriff, Chief Deputy, and co-workers; (4) obtain permission and work within common practice and procedures for leaving work during the work day; (5) investigate requests for information that fall within the scope of her duties before responding to inquiries; (6) schedule meetings with the Sheriff and note the subject of your meeting; (7) present a task list of work performed in general to the Chief Deputy each week; and (8) direct any questions about her employment to Chief Deputy Urquhart or Annalee Rosenblatt. SMF at p. 8, ¶ 53 (ECF No. 37-1 at 157–158). These items, when considered in conjunction with the fact that Kelly admits that she was able to request changes and clarifications over the course of approximately three months, *id.* at p. 8, ¶ 55 (ECF No. 37-1 at 18) and p. 9, ¶¶ 56-57 (ECF No. 37-1 at 18-21, 166-67), undermines the argument that the PIP amounted to the sort of informal harassment that would "deter a reasonably hardy individual from exercising [her] First Amendment rights," *Barton,* 632 F.3d at 29 (1st Cir. 2011).

### (iii)    Other Alleged Adverse Employment Consequences

Kelly has failed to allege or otherwise establish that the other purportedly adverse employment consequences raised in the Amended Complaint deterred her from exercising her free speech rights. *See* ECF No. 10. In fact, the record demonstrates that Kelly continued to speak her mind up the chain of command in the Sheriff's Office in the months following Wainwright's recommendation that her employment be terminated, Wainwright's and Urquhart's allegedly false testimony at Kelly's termination hearing, the delays in her return to work, and her one-week unpaid suspension. For example, Kelly emailed Wainwright, Urquhart, and Annalee Rosenblatt on May 15, 2020, to express her "observations of the documents sent" (i.e., her disciplinary notice and PIP), and complaining that items were "not stated in a way that makes sense, grammatically" and that another item was "incorrect in its premise." SMF at p. 9, ¶ 57 (ECF No. 37-1 at 166-67). Kelly also accused Wainwright, Urquhart, and Rosenblatt of an "explicit attempt to keep me from attending the Commissioners meetings." *Id.* at p. 9, ¶ 58 (ECF No. 37-1 at 166-67). In a May 19, 2020, email, Kelly also sharply questioned delays to her onboarding meeting. *Id.* at p. 9, ¶ 59 (ECF No. 37-1 at 169) ("Are the documents being updated or was this yet another excuse used to postpone my returning to work? I see it as a simple yes or no answer, please provide me with that answer."). Where Kelly is required to show acts which "would deter a reasonably hardy individual from exercising [her] First Amendment rights," *Barton,* 632 F.3d at 29 (1st Cir. 2011), her correspondence with Wainwright, Urquhart, and Rosenblatt belies any claim that she was cowed or deterred from speaking her mind.

Even assuming for the sake of argument that Wainwright and Urquhart gave false testimony at Kelly's termination hearing before the Oxford County Commissioners, the testimony did not deprive Kelly of anything, since the outcome of the hearing was that the Commissioners voted to

reinstate Kelly to her position and have her return to work. SMF at p. 7, ¶ 49 (ECF No. 10 at 6, ¶ 23). Thus, this cannot be considered an adverse employment action.

### 3.  Kelly Cannot Establish Causation

Even if Kelly were able to establish that she spoke out as a private citizen and that she suffered an adverse employment consequence, she cannot show that her speech on matters of public interest was the substantial or motivating factor.

Causation is ordinarily analyzed in two steps. *Davignon v. Hodgson,* 524 F.3d 91 (1st Cir, 2008) (citations omitted). First, the plaintiff must show that the employer would not have taken adverse action but for the plaintiff's speech. *Id.* (citing *Tejada–Batista v. Morales,* 424 F.3d 97, 101 (1st Cir. 2005).  If the plaintiff meets this burden, it shifts to the employer, who has an opportunity to sever the causal link. *Id.*

The record strongly suggests a motivating factor other than Kelly's remarks to the Commissioners, or her conversations with Rosenblatt in November 2019. Instead, Kelly acknowledges that she had an insubordinate outburst at Sheriff Wainwright on December 6, 2019, in which she asked him in a frustrated moment "do you ever do anything?" SMF at p. 6, ¶ 42 (ECF No. 37-1 at 9-10). She also admits that, when Wainwright responded to her comment by telling her to get in his office, she told him to "bring it," then stated that he did not deserve her respect, and told him that he was toxic to the Sheriff's Office. *Id.* at p. 6-7 ¶ 43 (ECF No. 37-1 at 9-10, 12). Kelly admits that her tone during the interaction was disrespectful and unprofessional. *Id.* at p. 7, ¶ 44 (ECF No. 37-1 at 12). It was just three days after this insubordinate outburst at Wainwright that he informed her that he was placing her on paid administrative leave and recommending her termination on December 9, 2019. *Id.* at p. 7, ¶ 46 (ECF No. 10 at 3, ¶ 14).

Given that a month passed after Kelly's remarks to the Commissioners and to Rosenblatt with no action taken against Kelly, followed by Kelly's almost immediate suspension so soon after her outburst at Wainwright, no reasonable jury would conclude that her November 2019 remarks at the Commissioners meeting and/or to Rosenblatt were the "but for" cause of the purportedly adverse employment consequences that Kelly faced.

### 2. Fourteenth Amendment Equal Protection Violation (Count IV)

Count IV of Kelly's Complaint alleges that the Defendants took adverse employment actions and applied Sheriff's Office policies in a discriminatory manner in violation of her equal protection rights under the Fourteenth Amendment of the U.S. Constitution. ECF No. 10 at p. 20, ¶ 64. Kelly also brings this claim pursuant to § 1983. *Id.* at 21.

To succeed on an equal protection claim, Kelly must establish that she was treated worse than similarly situated men based on impermissible considerations such as sex. *Alston v. Town of Brookline,* 997 F.3d 23, 41 (1st Cir. 2021). "[A] plaintiff's task is to identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently." *Id.* (quoting *Dartmouth Rev. v. Dartmouth Coll.,* 889 F.2d 13, 19 (1st Cir. 1989) (quotation marks omitted). Here, the "relevant aspects" that render someone similarly situated include job performance, qualifications, and conduct "without such differentiating and mitigating circumstances that would distinguish their situations."

### (a) Kelly Cannot Demonstrate That She Was Similarly Situated to Chief Deputy Urquhart or Lieutenant Libby

Kelly alleges that similarly situated male employees in the Sheriff's Office were not disciplined for having insubordinate confrontations with the Sheriff and for violating policies concerning courtesy, disrespect, and insubordination. ECF No. 10 at pp. 4-5, ¶¶ 17, 20, 21. However, Kelly identifies only two comparators: Chief Deputy Urquhart and Lieutenant Chancey

Libby. Kelly alleges that Chief Deputy Urquhart had a loud argument with the Sheriff and walked off the job, later to return without being disciplined. SMF at p. 5, ¶¶ 30-32 (ECF No. 10 at 12, ¶ 39A). Kelly also claims that Lt. Chancey Libby had a loud argument with Sheriff Wainwright and walked off the job, also to return later with no disciplinary consequences. *Id.* at  p. 5, ¶¶ 33-34 (ECF No. 10 at 12, ¶ 39B).

Neither allegation is sufficient to maintain an equal protection claim because there is no evidence that Kelly was similarly situated to either Urquhart or Libby. In fact, Kelly's own testimony establishes that that she was *dis*similarly situated to both men in terms of seniority and level of responsibility within the Sheriff's Office. Kelly admits that Chief Deputy Urquhart was junior in rank only to Sheriff Wainwright, SMF at p. 6, ¶ 35 (ECF No. 37-1 at 26), and that Lt. Libby, a detective in the criminal investigation division of the Sheriff's Office, had job responsibilities that differed dramatically from her own. SMF at p. 6, ¶ 36 (ECF No. 37-1 at 26) and ¶ 41 (ECF No. 37-1 at 26). Kelly also admits that both Chief Deputy Urquhart and Lt. Libby had significantly *more* responsibility in the Sheriff's Office than she did, SMF at p. 6, ¶ 37 (ECF No. 37-1 at 26); that she served in a support role for Urquhart and Libby, SMF at ¶ 40; and that both Chief Deputy Urquhart and Lt. Libby were sworn and certified law enforcement officers whereas she was not, SMF at p. 6, ¶¶ 38-39 (ECF No. 37-1 at 26).

Thus, even if Kelly's allegations concerning Urquhart's and Libby's purported confrontations are assumed to be true, the evidentiary record reflects a marked difference in rank, experience, and qualifications between the two men and Kelly and undercuts her argument that she was similarly situated to them and yet treated differently on account of her sex. *See Ayala-Sepulveda v. Municipality of San German*, 671 F.3d 24, 26, 32 (1st Cir. 2012) (reasoning that plaintiff, a gay man, failed to establish that he was similarly situated to his heterosexual

comparators because he had presented no evidence "regarding ... instances in which heterosexual employees *with similar rank and qualifications* were not transferred.") (emphasis added).

Furthermore, there is no evidence that either Urquhart or Libby made such blatantly insubordinate statements as Kelly admits to making, such as asking the Sheriff whether he "does anything?" or telling him that "you don't deserve my respect," and saying that he was toxic to the Sheriff's Office. SMF at pp. 6-7 ¶¶ 42, 45 (ECF No. 37-1 at 9-10, 40).

      **(b)**    **Kelly Has Offered No Evidence of Confrontations Between the Sheriff and Unnamed Male Employees in the Sheriff's Office**

Kelly also asserts that other male employees in the Sheriff's Office had confrontations with Wainwright similar to her own, and asserts that Urquhart acknowledged this, yet she has failed to identify anyone other than Urquhart and Libby. *See* ECF No. 10 at p. 4, ¶ 17; Kelly Dep. Therefore, Kelly's allegation with regard to these unidentified male employees should be disregarded at the summary judgment stage as conclusory and as lacking hard evidence of a material factual dispute. *Mendez-Aponte v. Bonilla,* 645 F.3d 60, 64 (1st Cir. 2011) ("We ignore any conclusory allegations, improbable inferences, and unsupported speculation.") (quotation omitted); *Griggs-Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990) (summary judgment opponent must "set forth specific facts showing there is a genuine issue for trial.") (quotation omitted).

      **(c)**    **Kelly Cannot Show That She Was Similarly Situated to Unnamed Male Employees.**

Even if the court does not disregard Kelly's claim as it relates to these unnamed "other male employees," her claim to be similarly situated to them is undercut by the fact that there is no evidence that any male officer made such blatantly insubordinate statements as Kelly admits to making, such as asking the Sheriff whether he "does anything?" or told him that "you don't deserve my respect." SMF at pp. 6-7 ¶¶ 42, 45 (ECF No. 37-1 at 9-10, 40).

### B.      STATE LAW CLAIMS

#### 1.      MHRA Sex Discrimination Claim

Count I of Kelly's First Amended Complaint alleges that she was subjected to unlawful employment discrimination because she is a woman, in violation of the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4572(1)(A). ECF No. 10 at 17, ¶¶ 50-51. Such a claim requires a plaintiff to demonstrate (1) that she is a member of a protected class; (2) that she performed her job satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that she was treated differently from similarly situated men. *Charette v. St. John Valley Soil and Water Conservation District,* 332 F. Supp. 3d 316, 438-49 (D. Me. 2018).

As discussed in greater detail above with regard to her 14th Amendment equal protection claim, Kelly's MHRA sex discrimination claim must fail for the same reasons: she has not mustered evidence to demonstrate that she was similarly situated to Chief Deputy Urquhart or Lieutenant Libby, or other unnamed Sheriff's deputies who she claims had confrontations with the Sheriff yet were not disciplined. In fact, with regard to the unidentified "other male employees" of the Sheriff's Office, she has not even produced evidence of their identity, or that such confrontations actually occurred.

#### 2.      Whistleblower Protection Act Claim

Count II of Kelly's First Amended Complaint alleges that she was retaliated against in violation of Maine's Whistleblower Protection Act, which prohibits retaliation against an employee who makes a good-faith report "to the employer or a public body what the employee has reasonable cause to believe is a violation of law or rule." § 833(1)(A).  To prevail on this claim, Kelly must prove three elements: (1) that she engaged in whistleblowing activity protected by the Act; (2) that she experienced an adverse employment action; and (3) that a causal connection

19

existed between the whistleblowing and the adverse employment action. *Pushard v. Riverview Psychiatric Ass'n.,* 2020 ME 23, ¶ 15.

Kelly alleges that Sheriff Wainwright was concerned by her "willingness to address issues with the operation of the [Sheriff's] Office, including with respect to the unequal treatment of employees, and ostensible cover up of employee misconduct." ECF No. 10 at 2, ¶ 10. As with her First Amendment claim, Kelly's specific allegations can be boiled down to two issues: (1) a car crash involving an Oxford County Sheriff's Office Sergeant, Chris Davis, and (2) alleged "unequal treatment of employees. *Id.* at 2, ¶ 10 and 14-15, ¶¶ 42-47.

**(a)     Kelly Did Not Engage in Protected Whistleblowing Activity.**

**(i) The Davis Car Crash and Investigation**

Kelly cannot establish that she engaged in protected whistleblowing activity with respect to the Davis car crash because the evidence demonstrates that the County was already aware of the crash and was actively investigating its circumstances before and throughout her involvement in the investigation. According to Kelly, she was informed of the crash by Chief Deputy Urquhart, her supervisor. SMF at p. 1, ¶ 3 (ECF No. 10 at 14-15, ¶ 42). When asked to describe her allegedly protected activity, Kelly described "ongoing discussions with Chief Urquhart from May through August" 2019. SMF at p. 1, ¶ 4 (ECF No. 10 at 14-15, ¶ 42). She also testified that during this timeframe, she met with an investigator *at the Commissioners' request* and told him what she knew of the crash. SMF at p. 2, ¶ 7 (ECF No. 37-1 at 72). Kelly also stated that after her meeting with Goodman, she remained in the room and Rosenblatt entered and began discussing the crash and asking Kelly questions concerning the whereabouts of the police cruiser involved in the crash, and even asked Kelly to investigate the whereabouts of the cruiser. SMF at p. 2, ¶¶ 8-9 (ECF No. 37-1 at 72). Kelly also stated that on November 4, she and Rosenblatt had another discussion about

the Sgt. Davis investigation and investigation at which Kelly expressed her dissatisfaction with the investigation and asked why the Commissioners were reluctant to go public. SMF at pp. 2-3, ¶¶ 10-12 (ECF No. 37-1 at 72). Thus, Kelly's own version of her discussions with Rosenblatt show that she was not reporting a previously unknown violation of law, but instead was alternately complaining about and discussing a matter already under widespread scrutiny at multiple levels of the County government.

Kelly also alleges that she attended a November 7, 2019, Commissioners' meeting and asked them "if they were comfortable with the actions taken by the Sheriff." SMF at p. 4, ¶ 18 (ECF No. 37-1 at 73). Yet again, Kelly's own version of events demonstrates that the County Defendants were already aware of the crash and its circumstances, and that Kelly's involvement was at the invitation and direction of her employer. *See id.* Moreover, Kelly's own version of her remarks at the Commissioners meeting does not support her claim that she made a good-faith report to her employer about a possible violation of law. Instead, Kelly testified that she merely asked the Commissioners a rhetorical question, i.e., whether they were comfortable with the payout of Davis's remaining vacation time. *See id.* She did not raise a previously unknown issue or impart new information, or any information, to the Commissioners.

These facts are analogous to those in *Pushard,* 2020 ME 23, ¶ 19, where the Law Court concluded that the plaintiff's complaints about hospital staffing were not whistleblower protected activity because he was not exposing a concealed or unknown safety issue, but was instead giving his opinion of his supervisor's attempts to address already-known problems related to staffing. The Court further stated that a plaintiff pursuing a whistleblower claim must show facts "sufficient to support a finding that [she] held a reasonable belief that staffing levels compromised the safety of

the residents *and that her complaints would bring the safety issue to [her employer's] attention*." *Id.* (citing *Cormier*, 2015 ME 161, ¶ 12, 129 A.3d 944) (emphasis in original).

Here, Kelly's allegations concern a purported violation of law and not a safety issue like in *Pushard. See id.* Nevertheless, like the plaintiff in *Pushard*, Kelly was not exposing a concealed or unknown issue or bringing a matter relating to legal compliance to her employer's attention. *See* SMF at p. 2, ¶¶ 7-11 and 3, ¶ 18. To the contrary, the record demonstrates that Urquhart, as Kelly's immediate supervisor, and higher-level officials such as the Commissioners and Rosenblatt, as their agent, were aware of the circumstances surrounding the crash. *Id.* at p. 1, ¶¶ 3-5 (ECF No. 10 at 14-15, ¶ 42; ECF No. 37-1 at 35, 72); p. 2, ¶¶ 7-11 (ECF No. 37-1 at 72 ); and p. 3, ¶ 18 (ECF No. 37-1 at 73). At best, Kelly has established only that she was vocal in expressing her dissatisfaction with the handling of the investigation, and that she asked the Commissioners a rhetorical question about Davis' vacation time payout. Under *Pushard* and *Cormier,* these do not constitute protected whistleblowing activity.

### (ii)    Unequal Treatment of Employees

Neither the First Amended Complaint nor the summary judgment record contains any specific detail as to where and when Kelly spoke out about purported unequal treatment of employees, what form it took, or to whom she spoke. *See generally,* ECF No. 10. While Kelly did state that she told Annalee Rosenblatt of "inappropriate behavior, in the way of speech," SMF at p. 3, ¶¶ 12-13 (ECF No. 37-1 at 72), she offers no indication of what was said or why the speech "inappropriate," *see id.* Nor does the record contain any indication of how Kelly's statement pertains to the alleged "unequal treatment" of employees by the County Defendants. Moreover, Kelly testified that her WPA claim is based on her concerns over the Davis car crash, not purported "inappropriate behavior" or speech. SMF at p. 3, ¶ 14 (ECF No. 37-1 at 27 ) (Q: "Just to make

sure that I'm not missing anything, your whistleblower protection claim is based on your report of your belief that there was a coverup involving this accident in general terms, is that fair?" A: "Yes.").

As with Kelly's 14th Amendment Equal Protection Claim, Kelly's allegation concerning "unequal treatment of employees" should be disregarded at the summary judgment stage as conclusory and as lacking evidence of a material factual dispute. *Mendez-Aponte v. Bonilla,* 645 F.3d 60, 64 (1st Cir. 2011) ("We ignore any conclusory allegations, improbable inferences, and unsupported speculation.") (quotation omitted); *Griggs-Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990) (summary judgment opponent must "set forth specific facts showing there is a genuine issue for trial.") (quotation omitted).

### (b)      Kelly Did Not Experience an Adverse Employment Action.

Kelly alleges that she was constructively discharged in retaliation for activity protected under the WPA. ECF No. 10 at 18-19, ¶ 58. She also alleged several other adverse employment actions, that mirror her First Amendment retaliation claim including: (i) purportedly false testimony given by Sheriff Wainwright and Chief Deputy Urquhart at Kelly's January 30 and February 6, 2020, termination hearing, SMF at p. 7, ¶ 48 (ECF No. 37-1 at 73); and (ii) the fact that her return date to the office from her paid suspension was repeatedly postponed over a period of approximately eight weeks, *id.* at p. 8, ¶ 54 (ECF No. 37-1 at 73). The County Defendants anticipate that Kelly will also allege other adverse employment actions in opposition to this motion, including: (iii) Sheriff Wainwright's recommendation that her employment be terminated, SMF at p. 7, ¶ 46 (ECF No. 37-1 at 73); (iv) the fact that she was suspended for one week without pay, ECF No. 10 at 6, ¶ 25; and (v) the fact that she was presented with a performance improvement

plan ("PIP") prior to her return to work, SMF at p. 7, ¶ 28 (ECF No. 10 at 15, ¶¶ 42-27). As discussed below, none of the above constitutes an adverse employment action under the WPA.

An "adverse employment action" under Maine's Whistleblower Protection Act is "an action that materially changes the conditions of an employee's employment." *Sullivan v. St. Joseph's Rehabilitation and Residence,* 2016 ME 107, ¶ 14 (citing *Higgins v. TJX Cos., Inc.,* 331 F. Supp.2d 3, 6-7 (D. Me. 2004)). "An employee has suffered an adverse employment action when the employee has been deprived . . . of 'something of consequence.'" *LePage v. Bath Iron Works,* 2006 ME 130, ¶ 20 (quoting *Blackie v. State of Maine,* 75 F.3d 716, 725 (1st Cir. 1996)). This may include such things as "a result of a demotion in responsibility, a pay reduction, or termination, or [where] the employer has withheld 'an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [the employee] for promotion after a particular period of service.'" *Id.* (quoting *Blackie,* 75 F.3d at 725). *See also Gu v. Boston Police Dep't,* 312 F.3d 6, 14 (1st Cir. 2002) ("Material changes include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'"). Despite her conclusory allegation that Sheriff Wainwright "materially and adversely alter[ed]" her employment, ECF No. 10 at 6, ¶ 24, Kelly has not demonstrated that any of the cited actions rise to this level.

### (i)    Kelly Has Not Established A Claim of Constructive Discharge.

When an employee who has resigned claims that they were constructively discharged, the employee has the additional burden of proving the constructive discharge. *Sullivan v. St. Joseph's Rehab. & Residence*, 2016 ME 107, ¶ 17, 143 A.3d 1283, 1288 (citing *Landrau–Romero v. Banco Popular De Puerto Rico,* 212 F.3d 607, 613 (1st Cir.2000) ("Alleging constructive discharge presents a 'special wrinkle' that amounts to an additional prima facie element.")). *See also Bodman*

*v. Me. Dep't of Health & Human Servs.,* 720 F.Supp.2d 115, 123 (D. Me. 2010) (characterizing constructive discharge as a "compound" claim). To do so, the employee must prove that (1) the employer engaged in unlawful retaliatory conduct that created working conditions so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (2) that the unlawful retaliatory conduct in fact caused the employee's resignation. *Sullivan,* 2016 ME at ¶ 17 (citation omitted). This is an objective standard, and "an employee's subjective perceptions do not govern." *Lee-Crespo v. Schering-Plough Del Caribe Inc.,* 354 F.3d 34, 45 (1st Cir. 2003).

As noted above, Kelly testified that she resigned because the documents associated with her May 21, 2020, on-boarding meeting with Urquhart and Rosenblatt had not been corrected to her satisfaction. SMF at p. 9, ¶ 61 (ECF No. 37-1 at 37) (Q: "So basically you were going in, if they've corrected the documents and if the position is as I believe it should be, then I'll stay but if not, I won't?" A: "Correct."). Specifically, Kelly objected to being suspended, to her job description, and to multiple unspecified office policies. SMF at p. 10, ¶ 62 (ECF No. 37-1 at 37) ("[T]he document where they put me on suspension, that was in there, again I stated my objections. The job description I pointed out this is still incorrect . . . and then as we went through all the list of the policies, procedures, I gave them different objections that I had within those policies as far as like what I saw could be problematic[.]").

Kelly cannot demonstrate constructive discharge based on these facts. It is not enough for an employee to demonstrate that she suffered "the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000). In order for a resignation such as Kelly's to constitute a constructive discharge, it must have been "void of choice or free will—[the] only option was to quit." *EEOC v. Kohl's Dep't Stores,*

*Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) (quotation marks omitted). "[A]n employee is obliged not to assume the worst, and not to jump to conclusions too fast." *Torrech–Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 52 (1st Cir. 2008) (quotation marks omitted). The record does not reflect such a stark situation for Kelly that her only choice was to resign. In fact, facts cited above demonstrate the opposite: she spent roughly three months fine-tuning her PIP and job description prior to her return to work. SMF at p. 9, ¶¶ 56-57(ECF No. 37-1 at 18-21, 166-67). That Kelly, Urquhart, and Rosenblatt engaged in this interactive process shows that Kelly did not believe that her only option was to resign her position.

In fact, their willingness to make changes to Kelly's PIP, job description, and other documents undercuts Kelly's claim of constructive discharge because "the evaluation of a constructive discharge claim takes into account how the employer responded to the plaintiff's complaints," *Lee-Crespo,* 354 F.3d at 45,

Additionally, the mere fact that Kelly was presented with a PIP does not demonstrate constructive discharge because "absent exceptional and objectively unbearable circumstances, a corrective performance plan does not present an opportunity to resign and label that resignation a 'constructive discharge.'" *Sullivan*, 2016 ME at ¶ 21.

Finally, and as noted above with respect to Kelly's First Amendment retaliation claim, the fact that Kelly appeared at her on-boarding meeting on May 21, 2020, carefully reviewed and signed each document one at a time, and then left to collect her things and turn in her resignation, SMF at p. 10, ¶¶ 63-66 (ECF No. 37-1 at 25, 37-38), further reflects the fact that Kelly had options that remained open to her even up to the last second before she quit. Therefore, Kelly was not "void of choice" as she is required to prove. *See EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d  at 134, *supra.*

### (ii) Alleged False Testimony

As noted above with regard to Kelly's First Amendment claim, even assuming for the sake of argument that Wainwright and Urquhart gave false testimony at Kelly's termination hearing before the Oxford County Commissioners, the testimony did not deprive Kelly of anything, since the outcome of the hearing was that the Commissioners voted to reinstate Kelly to her position and have her return to work. ECF No. 10 at 6, ¶ 23. Thus, this cannot be considered an adverse employment action.

### (iii)    Postponement of Kelly's Return to Work and Unpaid Suspension

Once again taking Kelly's assertions to be true for the sake of argument, and assuming that the approximately eight-week postponement of her return to work was not due to the ongoing Covid-19 pandemic (which was at its height during the spring of 2020), neither the delay nor Kelly's one-week unpaid suspension constitutes an adverse employment action because neither was as materially adverse as termination, demotion, or failure to promote, i.e., the type of adverse acts that take something of consequence from the employee and which have permanent or long-term consequences. *See LePage,* 2006 Me at ¶ 20, *supra.*; *Blackie,* 75 F.3d at 725-26 (alteration of a probation employee's status in a way that rendered them ineligible for preexisting pay premium was sufficiently material that it constituted an adverse employment action.) These are greater in severity and impact than an eight-week delay in returning to work, seven of which were paid. *See* ECF No. 10 at 6, ¶ 26; SMF at 8, ¶ 54.

### (iv)    Kelly's Performance Improvement Plan

It is undisputed that Kelly would have been subject to a PIP upon her return to work in May 2020 had she not first resigned. The PIP consisted of eight items that would have required Kelly to: (1) participate in on-boarding training to review County and Departmental policies that

applied to her; (2) review scope of her job description and to work within that description; (3) respond professionally, positively, and appropriately to the Sheriff, Chief Deputy, and co-workers; (4) obtain permission and work within common practice and procedures for leaving work during the work day; (5) investigate requests for information that fall within the scope of her duties before responding to inquiries; (6) schedule meetings with the Sheriff and note the subject of your meeting; (7) present a task list of work performed in general to the Chief Deputy each week; and (8) direct any questions about her employment to Chief Deputy Urquhart or Annalee Rosenblatt. SMF at p. 8, ¶ 53 (ECF No. 37-1 at 157–158). Kelly testified that she spent approximately three months, from February 18, 2020, to May 21, 2020, exchanging emails with Urquhart and Rosenblatt in which she worked out the details of the PIP and her job description and requested revisions to both. SMF at p. 8, ¶ 55 (ECF No. 37-1 at 18). Kelly also testified that she had outlined a number of things that she wanted corrected in the PIP. SMF at p. 9, ¶ 56 (ECF No. 37-1 at 18-21).

Kelly's PIP falls far short of other PIPs that have been found to constitute an adverse employment action. *Richard v. RSU 57*, 296 F.Supp.3d 274, 299 (D. Me. 2017) (PIP was adverse employment action where it required plaintiff, a first-grade teacher, "to engage in minute-by-minute planning on pain of violating the plan . . . when [plaintiff] was just a few minutes off the planned transition from one subject to another, she was cited for violating the PIP."). The requirements of Kelly's plan—reviewing the policies that applied to her, obtaining permission before leaving work during business hours, showing her direct supervisor the work that she performed each week, limiting inquiries about her employment to appropriate channels—in no way deprived her of anything of consequence, *LePage,* 2006 ME ¶ 20, and consisted of the type of rules and requirements one might find at any workplace. That Kelly was unhappy about the PIP

does not transform it into an adverse employment action. *Blackie*, 75 F.3d 716, 725 ("Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action."). Moreover, the fact that Kelly participated in a months' long dialogue with Urquhart and Rosenblatt about the terms of the PIP and her updated job description, and was even able to suggest corrections, undercuts a claim that her PIP was one that "might well dissuade a reasonable person from making or supporting a charge of discrimination." *Richard,* 296 F. Supp.3d at 299.

### (v)     Wainwright's Termination Recommendation

It is undisputed that Sheriff Wainwright recommended that Kelly's employment be terminated shortly after her outburst at him. ECF No. 10 at 3, ¶¶ 11-14. A recommendation of termination can be an adverse employment action, but in circumstances that result in an actual termination. *Roussel v. St. Joseph Hosp.,* 257 F. Supp.2d 280, 287 (D. Me. 2003); *Kelii v. Portland School Dept.,* 988 F. Supp. 14, 19 (D. Me. 1997). Here, it is also undisputed that Wainwright's recommendation was disregarded by the Commissioners, who voted not to terminate Kelly's employment and to reinstate her to her position. ECF No. 10 at 6, ¶ 23.

Moreover, courts have rejected retaliation claims even when there is a close timing relationship between the purported adverse employment action and the allegedly protected activity where the record shows favorable acts by the employer to the plaintiff. *Verrier v. Blue Triton Brands, Inc.*, 2022 WL 3347890, at * 61-62 (D. Me. Aug. 12, 2022). The Commissioners' decision to reinstate Kelly to her position evidences just such a favorable act. Thus, under the circumstances of this case, where Wainwright's recommendation was rejected, it does not constitute an adverse employment action.

### (c)     Kelly Cannot Establish a Causal Connection

Even if Kelly could demonstrate that she engaged in protected whistleblowing activity and that she suffered an adverse employment action, she is also required to show "but-for" causation, meaning that the adverse action must have been substantially motivated by the employee's protected activity. *Charette v. St. John Valley Soil and Water Conservation Dist.,* 332 F. Supp. 3d 316, 356 (D. Me. 2018). Furthermore, on a "summary judgment motion—just as at trial—the employee must not only produce evidence that she engaged in protected activity and later suffered an adverse employment action, but in the first instance she must also produce some evidence of the employer's unlawful motivation." *Brady v. Cumberland County*, 2015 ME 143, ¶ 33. "If the employer puts forth evidence of a legitimate non-retaliatory reason, the employee must adduce some evidence that the employer's proffered reason is pretextual." *Theriault v. Genesis HealthCare LLC,* 890 F.3d 342, 352 (1st Cir. 2018). A plaintiff may show pretext by establishing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for the challenged employment action. *Cookson v. Brewer Sch. Dept.*, 974 A.2d 276, 282 (Me. 2009).

Here, Kelly cannot show pretext because she acknowledges that she had an insubordinate outburst at Sheriff Wainwright, in which she asked him in a frustrated moment "do you ever do anything?" SMF at p. 6, ¶ 42 (ECF No. 37-1 at 9-10). She also admits that, when Wainwright responded to her comment by telling her to get in his office, she told him to "bring it," then stated that he did not deserve her respect, and told him that he was toxic to the Sheriff's Office. SMF at p. 6-7, ¶ 43 (ECF No. 37-1 at 9-10, 12). Kelly admits that her tone during the interaction was disrespectful and unprofessional. SMF at p. 7, ¶ 44 (ECF No. 37-1 at 12). Thus, even if the actions that followed this outburst were held to be adverse employment actions, i.e., Wainwright's recommendation that Kelly's employment be terminated, Kelly's one-week suspension, and the

imposition of a PIP, the County Defendants had legitimate, non-discriminatory reasons for taking them.

## IV.    CONCLUSION

For the foregoing reasons, the County Defendants respectfully request that the court grant this motion for summary judgment and dismiss Kelly's remaining claims.

Dated: January 26, 2024                              /s/ Michael Lichtenstein
                                                     Michael D. Lichtenstein, Esq.

                                                     /s/ Peter Marchesi
                                                     Peter T. Marchesi, Esq.

                                                     Wheeler & Arey, P.A.
                                                     Attorneys for Defendants Oxford County and
                                                     the Oxford County Sheriff's Office
                                                     27 Temple Street
                                                     Waterville, ME 04901

## UNITED STATES DISTRICT COURT
### District of Maine

|  |  |  |
|---|---|---|
| JOAN M. KELLY, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Docket No. 2:22-cv-00341-LEW |
| OXFORD COUNTY, OXFORD COUNTY | ) | |
| SHERIFF'S OFFICE, CHRISTOPHER R. | ) | |
| WAINWRIGHT, AND JAMES H. | ) | |
| URQUHART, | ) | |
| Defendants | ) | |

### <u>CERTIFICATE OF SERVICE</u>

I, Michael Lichtenstein, hereby certify that:

●     Motion for Summary Judgment filed by Defendants Oxford County and the Oxford County Sheriff's Office

has been served this day on Plaintiff by filing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

|  |  |
|---|---|
| Adam R. Lee, Esq. | *Alee@tmbf-law.com* |
| John Wall, Esq. | *jwall@monaghanleahy.com* |

Dated:  January 26, 2024

/s/ Michael Lichtenstein
Michael Lichtenstein, Esq.
Wheeler & Arey, P.A.
Attorneys for Defendants Oxford County and Oxford
County Sheriff's Office
27 Temple Street
Waterville, ME  04901